515 P.2d 1175

**CITY OF PHOENIX, a political subdivision of the State of Arizona, Plaintiff-Petitioner,**

v.

**The SUPERIOR COURT of the State of Arizona, IN AND FOR the COUNTY OF MARICOPA, and Edwin Thurston, Judge thereof, and Sidney M. Rosen and Babette Rosen, his wife, Defendants-Respondents.**

**No. 11283.**

Supreme Court of Arizona, En Banc.

Nov. 15, 1973.

Joe R. Purcell, City Atty., by Donald W. Lindholm, Asst. City Atty., Phoenix, for plaintiff-petitioner.

Kenney & Rosen by Donald J. Kenney and Sidney M. Rosen, Phoenix, for defendants-respondents.

HAYS, Chief Justice.

This is a special action brought in this court by the City of Phoenix against the Superior Court of Maricopa County. The real respondents in interest are Sidney Rosen, a Phoenix attorney, and his wife.

The only issue raised is whether the Superior Court, in a petition for special ac-

tion in the nature of a petition for a writ of certiorari, directed to the Phoenix [Zoning] Board of Adjustment, may hold a trial de novo, or whether it is limited to reviewing the record made before the Board of Adjustment.

In April of 1971, Mr. Rosen purchased a house located at 119 East Alvarado Road, in Phoenix. The house had been built in 1927 on property that had been annexed to the city in 1919. Prior to June, 1930, the City of Phoenix had not passed any zoning ordinances affecting this property.

The premises included not only the house, but also one outbuilding, the nature of which is in dispute. Mr. Rosen claims that it was residential in nature because it had electricity, water, a large window, and ducts connecting it to the house for purposes of heating and air conditioning. Letters and statements in the file from neighbors indicate that Mrs. Peterson, from whom Rosen bought the property, had owned the premises for over thirty years, during which time the outbuilding was used as a storeroom for garden tools, ladders, etc., and that she had not, during those thirty years, converted the building into living quarters.

Mrs. Rosen testified that she had a son and a daughter who were reaching the age when they would need separate bedrooms, and that eventually they intended to use the outbuilding for a bedroom for one of the children, and would not have purchased the home were it not for this fact.

Mr. Rosen concedes that the residence is forty-three years old and "there are no accurate records available of the original builder's intent and/or actual usage of this annex," but because of the presence of water, electricity and ducts, "it is our understanding" that the annex had been used, or was planned to be used, as quarters for a maid who would work in the house. Many of these facts have been gleaned from a letter from Rosen to the chief zoning inspector of the city. In that letter, Rosen wrote that he had remodeled the outbuilding (which he refers to as an annex), re-paneled some of the walls, painted the unit thoroughly, put in carpeting and furnishings, and "are using it as an integral bedroom for our home." He concluded the letter as follows:

" . . . It never occurred to us that there might be any possible violation of a setback ordinance. . . . Needless to say, with the remodeling concluded and with this annex being used as a regular bedroom of our home at the present time, we would be most appreciative if you could see fit to provide the necessary variance and remove whatever potential violation Mr. Guilfoyle may feel exists."

In reply, the chief zoning inspector wrote Mr. Rosen under date of January 26, 1972, that "the setbacks . . . are a non-conforming use" which could lawfully continue "as long as it were not expanded, or abandoned for a period exceeding one year."

In Mr. Rosen's testimony before the Board of Adjustment, he stated that the annex was leased by him on February 12, 1972, to an elderly crippled woman in reliance on the January 26, 1972, letter.

Rosen admits that the neighborhood is zoned for single family dwellings. Upon discovering that there were two families living on the premises (the Rosens in the house and the tenant in the annex), the neighbors became perturbed and twenty-four of them made formal protest to the city. Thereupon, the city wrote Mr. Rosen that new information received was contrary to the facts previously submitted to them, and that while the setbacks could be treated as a legal nonconforming use, the occupation of the annex by one not a member of Rosen's family was illegal and would have to cease.

A hearing was duly held by the Board of Adjustment on October 25, 1972. Mr. Rosen testified that the annex had "complete electricity" when he bought it. One of the neighbors, in a statement in the record, said it had only a single drop cord with a bulb. Rosen further stated (none of the

testimony was under oath) that "[o]ur information was that this was built originally as a maid's quarters . . ." and that the present rental situation was temporary to help pay the mortgage, until it was necessary for his two children to have separate bedrooms. Mr. Rosen admitted putting in a partition and rewiring the annex. He admitted insulating the building. He admitted it was filthy and used only for storage when he bought the place. He also installed a small portable unit that combined a sink, range and refrigerator.

Rosen complains about the revocation of the decision that a nonconforming use existed and claims that the time to appeal had expired. The Board felt the city could not appeal since it had no notice of the decision, which was merely a letter to Mr. Rosen, with no notice to anyone. It also felt the letter did not refer to a nonconforming use except in the context of the setback and Rosen's representation that it was being used as a regular bedroom by a member of the family, which was no longer the situation.

Counsel for the protesting neighbors argued to the Board that it could not grant a variance to a single owner and thus permit him to have more than one family separately housed on a lot in a neighborhood zoned for single family residences. He also argued that even if Rosen could prove an actual rental many years ago, such a two-family use had been abandoned nearly thirty years before, according to the information before the Board, and it cannot now be resumed after the zoning has changed. He stated that if and when Rosen desired to have his children sleep in the annex, no neighbor could or would object.

■ Most of the above information comes from the file in the Superior Court case where the petition for a special action is still pending. We take judicial notice of Superior Court records. State v. Valenzuela, 109 Ariz. 109, 506 P.2d 240 (1973).

While the action in Superior Court was pending, Rosen moved that the trial be de novo and the trial court granted the mo-

tion. The present special action in this court, filed by the city, asks that the ruling allowing a trial de novo be reversed.

The city argues that although certiorari is now lumped with other special writs under the generic term "special action," the rules pertaining to it have not changed, and the court can only review the record as it finds it and can hardly do this if the record is permitted to be supplemented by further testimony in Superior Court. The city also argues that if every disgruntled property owner is permitted to have a trial de novo on certiorari, the city will be unable to cope with the added expense and unable to supply legal personnel to defend all such cases.

Rosen, on the other hand, contends that the hearing before the Board of Adjustment was unfair in that the Board cross-examined him but did not accord him the privilege of cross-examining the opposing witnesses, and in that the Board had a long agenda and rushed the matter through without giving him all the time he needed to develop his side of the issues. He argues that because of these facts he should be allowed to have a trial de novo at which he can go into the matter at greater length, produce additional witnesses, etc. The principal difficulty with his arguments is that they rest on statements of fact that are not true. The only thing in the complete transcript of the hearing to indicate that he was hurried was the following remark of the chairman:

> "Mr. Rosen, as we have a rather full agenda yet ahead of us, I wonder if we might have you come direct to the point in relation to the opposition's arguments. And then, secondly, present your arguments on part two." [Part two is not in issue here; it pertained to another matter which Mr. Rosen conceded.]

The remark was couched in polite terms and was no more coercive than the remarks of any judge trying any other case, in which he suggests that one or the other party get on with his evidence. The remark was neither repeated nor enforced and Mr. Rosen went on: "With all due re-

spect to the agenda, let me just comment . . . " and proceeded to continue to talk and argue for an additional two single-spaced typewritten pages to complete the point he wanted to make, at the end of which he stated: "We have nothing further to add." He did not suggest that he had further material but in deference to the full agenda he would pass over it. In addition, at no point in the transcript does it appear that Mr. Rosen was prevented from cross-examining his opposing witnesses or that he even tried or asked to do so.

As we have stated, Rosen entered the Superior Court via a petition for special action, which is merely a new name coined to include petitions for writs of mandamus, certiorari and prohibition. The cases relative to procedures under the old names apply to the new name.

A.R.S. § 9–465 subd. E provides:

"A person aggrieved by a decision of the board [of adjustment] may . . . petition a writ of certiorari for review of the board's decision. . . ."

█ Rosen, therefore, is properly before the Superior Court and it is the duty of that court to examine the record certified to it by the Board. The limits of the court's powers under a writ of certiorari vary from state to state, and in Arizona they vary from one situation to another. The right to appeal exists only by force of statute and is limited to the terms of the statute. Smith v. Trott, 36 Ariz. 166, 283 P. 726 (1930). Generally, in Arizona, appeals from administrative boards permit the issues to be tried de novo. A.R.S. § 12–910 subd. B. Trials de novo are the rule where an appeal is taken from justice court to the Superior Court. R.C.P. 80(c).

Section 9–465 subd. E, *supra*, does not provide for a trial de novo and in our opinion the omission of any such provision was deliberate and there is no reason to read anything into the statute to allow a trial de novo.

As we said in Mercado v. Superior Court, 51 Ariz. 436, 77 P.2d 810 (1938):

"When a writ of certiorari is before this court, we are bound by the record sent up from the tribunal whose action we are reviewing as to what actually occurred therein and may not consider any extraneous matters, such as allegations in the petition or the reply. The record imports absolute verity and is conclusive upon the court. . . . And when the return is made, the court must proceed on the assumption that the entire record of the proceeding challenged is before it, rejecting all affidavits or other proof introduced to impeach or support the record. . . . If the parties are of the opinion that the record, as certified, does not show the true situation, the proper course is to obtain an amended return, and not to impeach it by affidavits or other proof."

█ What applies to this court applies to the Superior Court. *See also* Sevilla v. Sweat, 9 Ariz.App. 183, 450 P.2d 424 (1969), in which the Court of Appeals said that the Superior Court, in reviewing a decision of the Board of Adjustment, is limited to finding error and may not substitute its opinion of the facts for the Board's and if the evidence supports the Board's decision, it should be affirmed.

If, upon examination of the record, the Superior Court finds undue haste, unfair procedures, mistakes of law, etc., the court may return the record to the Board with instructions to give the aggrieved person more time and fairer procedures and to apply correct rules of law in accordance with the court's opinion. As was said in *Sevilla, supra,* the authority of the Superior Court is much broader under A.R.S. § 9–465 subd. E than in ordinary cases of certiorari.

We remand to the Superior Court with instructions to vacate its order granting a motion for a trial de novo and for further proceedings consistent with this opinion.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD, and HOLOHAN, JJ., concur.